# In the United States Court of Federal Claims

No. 12-882C

(Filed Under Seal: January 18, 2013)
(Reissued: January 25, 2013)

************************************

|  |  |  |
|---|---|---|
| KWV, INC., | ) | Pre-award bid protest; motion for |
|  | ) | preliminary injunction; disparate intra- |
|  | ) | agency decisions regarding the level of |
| Plaintiff, | ) | control exercised by a veteran owning a |
|  | ) | small business; evidence of "control" within |
| v. | ) | the meaning of 38 C.F.R. § 74.4 |
|  | ) |  |
| UNITED STATES, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

************************************

William M. Weisberg, Bryan Cave LLP, Washington, D.C., for plaintiff. With him on the briefs were Joyce L. Tong Oelrich, and Liana W. Yung, Bryan Cave LLP, Washington, D.C.

Alexis J. Echols, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Dennis Foley, Counselor to the Assistant General Counsel, and Aleia Barlow, General Attorney, Office of the General Counsel, United States Department of Veterans Affairs.

## OPINION AND ORDER[1]

LETTOW, Judge.

Pending before the court is plaintiff's motion for a preliminary injunction in this pre-award bid protest. On February 7, 2012, plaintiff, KWV, Inc. ("KWV"), had obtained a determination from the Department of Veterans Affairs' ("VA's") Center for Veterans Enterprise ("CVE") that it was a qualified veteran-owned small business ("VOSB") concern eligible to participate in VA's Veterans First Contracting Program, which accords priority to VOSBs and service-disabled veteran-owned small businesses ("SDVOSBs") for contracting opportunities.

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before January 24, 2013. No redactions were requested.

Nonetheless, after KWV had ostensibly won an award of a contract as a VOSB, an agency protest by a losing bidder resulted in a decision by VA's Office of Small and Disadvantaged Business Utilization ("OSDBU") that KWV "d[id] not meet the status requirements of a SDVOSB concern" and was therefore ineligible for awards under the Veterans First Contracting Program. AR 570 (Letter from Thomas Leney to James Maron (Oct. 24, 2012)).[2] KWV challenges that decision and seeks both to be reinstated into the Program and to obtain an injunction barring VA from awarding contracts upon solicitations on which KWV had submitted bids. After a hearing held on December 20, 2012, the court granted a temporary restraining order constraining VA's action on certain solicitations until KWV's protest was resolved, and after a hearing on January 4, 2013, that temporary restraining order was extended. The second temporary restraining order temporarily set aside VA's delisting of KWV as a firm qualifying for participation in the Veterans First Contracting Program.

## FACTS[3]

KWV is a close corporation under Rhode Island General Laws § 7-1.2-1701. Compl. ¶ 17. James Maron, a veteran of the United States Army Corps of Engineers, owns 60 percent of the issued and outstanding shares of the company, with the remaining shares being split between his two sons and one granddaughter. Compl. ¶ 18. Mr. Maron has more than 50 years experience in construction and more than 30 years of experience as a contractor, Compl. ¶¶ 15-17, and he now focuses solely on KWV, which he formed in 2008 as a VOSB after enactment of the Veterans Benefits, Health Care, and Information Technology Act of 2006 ("Veterans Benefits Act"), Pub. L. No. 109-461, tit. V, 120 Stat. 3403, 3425 (codified at 38 U.S.C. §§ 8127-28), *see* AR 513. That Act, signed into law on December 22, 2006, directs the Secretary of Veterans Affairs in procurements using contracting preferences to "give priority to a small business concern owned and controlled by veterans, if such business concern also meets the requirements of that contracting preference." 38 U.S.C. § 8128(a).[4] Mr. Maron has had longstanding success as a contractor in Rhode Island. AR 513. At this point in his career, Mr. Maron divides his time between Florida and Rhode Island. Although Mr. Maron legally

---

[2]"AR __" refers to the administrative record certified by VA and filed with the court in accord with RCFC 52.1(a).

[3]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions related to prejudice and equitable relief. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States*, 75 Fed. Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings . . . from the [administrative] record as if it were conducting a trial on the record.'" (quoting *Acevedo v. United States*, 216 Fed. Appx. 977, 979 (Fed. Cir. 2007))).

[4]The priority contracting preferences for SDVOSBs and VOSBs apply only to procurements by VA. *See Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 222 (2010) ("The Veterans Benefits Act is a specific mandate to the Department, and only to the Department, to grant first priority to SDVOSBs and VOSBs in the awarding of contracts.").

2

resides in Florida, he spends just less than half of any calendar year in Rhode Island. AR 540.

Mr. Maron served in the Korean War from 1952 to 1954, at which time he was honorably discharged. Compl. ¶ 13. Following his discharge, he worked as a carpenter and estimator at various construction companies, and in 1977 he and his wife founded Maron Construction Incorporated. AR 513; Compl. ¶ 14.[5] Mr. Maron led that firm's operations until he retired and his children took over management. AR 162. On October 31, 2008, however, he incorporated KWV, a new company, to operate as a VOSB. Compl. ¶¶ 16-17. At that time, the Veterans First Contracting Program functioned on a self-certification basis, and KWV won and performed two or three projects as a self-certifying concern. AR 508-09, 540. A verification program was established by VA in 2010, and on January 14, 2011, KWV applied for inclusion in the VA VetBiz Vendor Information Pages ("VIP") Verification Program as a VOSB. Compl. ¶ 19. KWV's application was initially denied on September 22, 2011, because KWV's incorporation documents indicated that the company was controlled by a board comprised primarily of non-veteran directors, rather than by Mr. Maron as the majority shareholder. AR 451. KWV then amended its corporate documents to reflect Mr. Maron's control and requested reconsideration by VA on October 12, 2011. AR 455-94. CVE conducted a thorough investigation of plaintiff, performing a site visit, interviews, and review of documentary submissions from the company. *See* AR 495-515.2. Subsequently, on February 7, 2012, CVE approved KWV as a VOSB and added it to the database of companies eligible for Veterans First Contracting Program projects. AR 516-17.[6]

After its verification as a VOSB, KWV proceeded to bid on contractual opportunities provided by VA for the Boston Health Care System ("BHS"). Compl. ¶¶ 1, 45. As a self-certifying entity, KWV had previously secured Contract Nos. VA241-C-1312 and VA523-C07071, both related to the West Roxbury VA Medical Center, *see* AR 508-09, which qualified it to bid on posted solicitations under the BHS project in 2012. KWV was subsequently awarded Task Order No. VA241-12-J-1036 (part of Solicitation No. VA-241-12-R-0563) on July 11, 2012. Compl. Ex. 4 (Award Letter from Athena Jackson to Thomas Maron (July 11, 2012)).

On August 4, 2012, Alares, LLC ("Alares"), a disappointed bidder, filed a formal protest with VA, alleging that Mr. Maron did not in fact control KWV. AR 518. This protest posited that Mr. Maron's two non-veteran sons, David and Thomas Maron, were the true controlling owners of KWV, evidenced in part by the fact that Mr. Maron resides in Florida for a substantial part of the year. AR 519.

OSDBU initiated an investigation into KWV's qualifications as a VOSB. KWV submitted a response explaining its operating posture, accompanied by Mr. Maron's tax statements, a Rhode Island condominium deed and recent utility bills in his name, KWV's By-Laws and Operating Agreement, a copy of the original VA verification letter, and photographs of KWV's headquarters' location. AR 538-66. KWV averred that Mr. Maron indeed resided in

---

[5]Apart from his experience as a carpenter and estimator, Mr. Maron attended the Rhode Island School of Design from 1954 to 1958, focusing on building construction. AR 434.

[6]The eligibility certification was valid for one year from the date of verification. AR 516.

Florida but that he spent just short of one-half of each year at his home in Rhode Island. AR 540. KWV's response detailed the methods by which Mr. Maron managed KWV on a day-to-day basis during the times he was in Florida, using telephone, e-mail, and other electronic means. *Id*. OSDBU did not conduct a site visit during this investigation, and did not conduct any interviews with Mr. Maron or other KWV employees. Compl. ¶ 53. On October 24, 2012, OSDBU sustained the protest and disqualified KWV from participation in the Veterans First Contracting Program. AR 568-71. The decision was framed in terms of whether KWV qualified as a valid SDVOSB, a designation which was neither claimed by KWV nor contested by Alares. AR 568.[7]

OSDBU found that Mr. Maron satisfied the majority ownership requirements to be a SDVOSB, but it concluded that Mr. Maron did not have enough control over the day-to-day management of KWV because of his Florida residency. AR 569-71. As a result of the revocation of its VOSB eligibility, KWV's awarded contract was terminated, and its pending and future proposals for other VOSB projects (including five under the BHS Multiple Award Task Order Contract No. VA241-C-1312) were disqualified. *See* AR 571 ("[KWV] cannot submit another offer as a VOSB or SDVOSB on a future VOSB or SDVOSB procurement under [38 C.F.R. Part 74], as applicable, unless it demonstrates to VA's Center for Veterans Enterprise that it has overcome the reasons for the determination of ineligibility, if it is able, by applying for and receiving verified status in accordance with 38 C.F.R. Part 74."); *see also* Compl. ¶¶ 58-74.

On December 14, 2012, KWV filed a pre-award bid protest action in this court, alleging that OSDBU's determination was unreasonable and contrary to law, and seeking reinstatement as a VOSB. On the same day, KWV applied for a temporary restraining order pending resolution of its motion for a preliminary injunction. After a hearing, a temporary restraining order was issued on December 21, 2012, and then extended on January 4, 2013. At a hearing held on January 4, 2013, the court also heard arguments on KWV's motion for preliminary injunction.

## JURISDICTION

Under the Tucker Act as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), this court has jurisdiction over (1) pre-award bid protests, (2) post-award bid protests, and (3) an alleged violation of a statute or regulation in connection with a procurement:

> [T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement*. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

---

[7]OSDBU issued a correction on November 19, 2012, recognizing that KWV had sought to be, and had previously been, certified as a VOSB, not a SDVOSB. AR 567.

4

28 U.S.C. § 1491(b)(1) (emphasis added). *See also Rothe Dev., Inc. v. United States Dep't of Def.*, 666 F.3d 336, 338 (5th Cir. 2011) ("[T]he Court of Federal Claims now retains exclusive jurisdiction over 'action[s] by an interested party' 'objecting to … any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'" (citing 28 U.S.C. § 1491(b)(1))).

KWV alleges that VA contravened its regulations governing VOSB eligibility through an unreasonable and inconsistent application of 48 C.F.R. § 819.307 (pertaining to "SDVOSB/VOSB Small Business Status Protests")[8] and 38 C.F.R. Part 74 (setting out VA's "Veterans Small Business Regulations"). Section 74.3 of 38 C.F.R. Part 74 specifies the standards for CVE's evaluation of applicants for VOSB status and the eligibility for inclusion in the Veterans First Contracting Program, and those standards are explicitly incorporated by reference in the VAAR provisions governing SDVOSB and VOSB small business status protests. *See* 48 C.F.R. § 819.307(c). KWV's allegations thus properly invoke this court's bid protest jurisdiction under the third prong of Paragraph 1491(b)(1). *See RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("§ 1491(b) . . . does not require an objection to the actual contract procurement . . . .  As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."); *Angelica Textile Servs.*, 95 Fed. Cl. at 215 ("The phrase 'in connection with' is very sweeping in scope."  "[A] procurement 'includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with the contract completion and closeout.'" (quoting *RAMCOR*, 185 F.3d at 1289 (first quote); 41 U.S.C. § 403(2) (second quote))); *OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 117 (2005) (holding that the "broad language" of Subsection 1491(b) demonstrated "Congress's expressed intent that the Subsection encompass the entire procurement process"). Accordingly, this court finds that it has jurisdiction to consider this dispute under 28 U.S.C. § 1491(b)(1).

## DISCUSSION

### A. *Statutory and Regulatory Framework*

The statutory predicate for the Veterans First Contracting Program is the Veterans Benefits Act, which provides in pertinent part that "[i]n procuring goods and services pursuant to a contracting preference under this title or any other provision of law," VA "shall give priority to a small business concern owned and controlled by veterans," provided that the business is included in a small business database maintained by VA.  38 U.S.C. § 8128.  To implement this Act, VA established the Veterans First Contracting Program in 2007, directing its contracting officers to consider SDVOSB and VOSB entities as first and second priority.

---

[8] 48 C.F.R. Parts 801-873 constitute the Veterans Affairs Acquisition Regulation System ("VAAR").

For some time, VOSB and SDVOSB entities certified themselves and self-registered in the VIP vendor database. Statutory amendments now set out at 38 U.S.C. § 8127(e) and (f) clarified the responsibilities of the Secretary of the Department of Veterans Affairs in addressing and verifying applications for inclusion in the database. *See also* VA Acquisition Regulation: Supporting Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses, 74 Fed. Reg. 64,619-01 (Dec. 8, 2009) (codified at 48 C.F.R. Parts 802, 804, 808, 809, 810, 813, 815, 817, 819, and 852) (effective Jan. 7, 2010); 75 Fed. Reg. 6098-01 (Feb. 8, 2010) (codified at 38 C.F.R. Part 74) (effective Feb. 8, 2010). The effect of those clarifications was the institution of mandatory verification by CVE, even for businesses that may have previously self-certified. In sum, VIP eligibility certification through CVE is governed by 38 C.F.R. Part 74, but CVE's approval may be challenged through an agency-level bid protest with OSDBU, as provided in 48 C.F.R. § 819.307.

The standards for initial certification and eligibility reevaluation are congruent respecting ownership and control because, as noted *supra*, Part 819 incorporates by reference Part 74 for guidance on "ownership and control issues." Part 74 addresses ownership and control in great detail, couching the eligibility criteria in terms of what CVE considers to be qualifying. *See* C.F.R. §§ 74.3 (ownership), 74.4 (control). In answer to the question "Who does CVE consider to control a veteran-owned small business?" Section 74.4 defines control as "the day-to-day management and long-term decision-making authority for the VOSB." 38 C.F.R. § 74.4(a). Also, "CVE regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations . . . . Individuals managing the concern must have managerial experience of the extent and complexity needed to run the concern." 38 C.F.R. § 74.4(b).

Part 74 also provides procedures for CVE to consider cancellation of VOSB status. Cancellation proceedings may be triggered by CVE "[w]hen CVE believes that a participant's verified status should be cancelled prior to expiration of its eligibility term." 38 C.F.R. § 74.22(a). CVE is required to give notice to the firm in question, which is provided a thirty-day period in which to respond. § 74.22(b). CVE is obliged then to issue a decision setting forth the specific facts and reasons for its result. § 74.22(c). An appeal process is provided. § 74.22(e).

The agency bid-protest procedures in the VAAR are more cryptic but comparable. Protests relating to VOSBs or SDVOSBs "must be in writing and state specific grounds for the protest." 48 C.F.R. § 819.307(c)(1). They must be filed on or before the fifth business day after bid opening in sealed-bid acquisitions or notification by the contracting officer of the apparently successful offeror in negotiated acquisitions. § 819.307(c)(2). The regulation does not in terms specifically provide an opportunity for the successful offeror to respond to the protest, but as this case demonstrates, basic due process considerations apply to enable the successful offeror to be heard. Paragraph (c)(3) of 48 C.F.R. § 819.307 is ambiguous in describing the consequences that arise when OSDBU sustains a protest:

> (3) If the Executive Director sustains a service-disabled veteran-
> owned or veteran-owned small business status protest and the contract
> has already been awarded, then the contracting officer cannot count the
> award as an award to a VOSB or SDVOSB and the concern cannot submit

another offer as a VOSB or SDVOSB on a future VOSB or SDVOSB procurement under this part, as applicable, *unless it demonstrates to VA that it has overcome the reasons for the determination of ineligibility*.

§ 819.307(c)(1) (emphasis added). It is not apparent what opportunity a previously successful offeror subject to a sustained protest would have to "overcome the reasons for the determination of ineligibility," *id*., either during the protest as such, or thereafter.

In this case, the divergent results produced by CVE and OSDBU cannot be attributed to the application of a disparate standard or to any procedural distinction.

### B. *Standards for Preliminary Injunction*

The court must consider four factors when contemplating whether to grant a preliminary injunction: (1) likelihood of plaintiff's success on the merits, (2) irreparable harm to plaintiff if an injunction is not granted, (3) the balance of hardships, and (4) the public interest. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012); *see also Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff must establish the existence of a reasonable likelihood of success on the merits and irreparable harm in the absence of an injunction, while the last two factors are not required but are weighed in the balance. *See Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction."). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948, at 129–30 (2d ed. 1995)) (emphasis in the original).

### 1. *Likelihood of success on the merits.*

Plaintiff must demonstrate that it is more likely than not to succeed on the merits of its claim to qualify for a preliminary injunction. *See Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012) (holding that for matters unique to the Federal Circuit, a preliminary injunction with the effect of altering the status quo must meet the standard of "more likely than not," not a "clear or substantial likelihood" standard as required by certain other circuits in particular types of cases).

On the merits, KWV will have to prove that the government's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706(2)(A)).[9] KWV contends that OSDBU's determination was far less searching and careful than the prior verification by CVE, and relied

---

[9]Plaintiff must also ultimately show that it was prejudiced by the government's arbitrary or unlawful conduct. *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (requiring a "prejudicial violation" of applicable statutes or regulations). Such prejudice is discussed *infra* in the context of irreparable harm.

solely, and wrongly, on the assumption that Mr. Maron could not exercise effective control of KWV when he spends six months and a day of each year in Florida rather than Rhode Island. Pl.'s Mem. in Support of Pl.'s Emergency Mot. for Prelim. Inj. ("Pl.'s Mem.") at 15. The government counters that OSDBU's decision was neither arbitrary and capricious nor contrary to standards because OSDBU based its decision on a fact unknown to CVE at the time of CVE's VOSB certification, *i.e.*, Mr. Maron's residency, which came to light during the OSDBU investigation. Hr'g Tr. 28:20-29:5 (Jan. 4, 2013); *see also* Def.'s Resp. to Pl.'s Mot. for Preliminary Inj. ("Def.'s Opp'n") at 6-7. Whether CVE *actually* lacked this information is disputed by the parties.[10] The record before CVE and produced with its decision does not place Mr. Maron's residency in any particular state, giving the court no indication as to whether CVE was in fact aware of it at the time. *See* AR 1-517; Hr'g Tr. 33:14-25 (Jan. 4, 2013); Hr'g Tr. 22:9-23:10 (Dec. 20, 2012).

The OSDBU inquiry was markedly less thorough than that of CVE. The CVE examination included a site visit in December 2011 to KWV's headquarters to examine KWV's physical setting and to interview Mr. Maron and others, as well as to provide a context for review of documentary records. *See* AR 495-515.2 (Letter from Dan Friend to Bruce St. John (Dec. 19, 2011)); AR 1-159 (Initial Application for CVE Verification). Additionally, CVE requested supplemental documentation from plaintiff, beyond what was filed with the application for VOSB verification, and asked specific questions to illuminate certain areas of the application. AR 160-61 (E-mail from Dawn Monahan to James Maron (Sep. 15, 2011)). KWV and Mr. Maron provided the requested information and responded to CVE's questions. AR 162-450 (Additional Documentation and Correspondence). After CVE initially declined to verify KWV as a VOSB, AR 451-53 (CVE Denial Letter), Mr. Maron was permitted to cure the alleged defects in his application by amending KWV's by-laws, and to request reconsideration, AR 454-94 (Correspondence and Documentation Regarding Reconsideration). By the time CVE issued the VOSB certification for KWV on February 7, 2012, CVE had reviewed hundreds of pages of documents, performed a site visit and interviews in December 2011, and had been corresponding with Mr. Maron for nearly five months. *See* AR 516-17 (CVE Approval Letter). Aspects of the CVE investigation were documented thoroughly and are now in the administrative record before the court.

In comparison, the OSDBU investigation appears to have been cursory. No site visit was conducted by OSDBU. *See* Hr'g Tr. 10:2-10; 11:19-12:1 (Dec. 20, 2012). No interviews were conducted by OSDBU. *Id.* OSDBU afforded Mr. Maron an opportunity to respond to the protest but did not follow up with any questions or concerns it may have had. Much of the OSDBU decision is taken up by a word-for-word recitation of regulations found in Parts 819 and 74. AR 568-71. The findings themselves give few clues as to how OSDBU reached its decision, stating merely that "[b]ecause construction requires the direct supervision of the work to be

---

[10]KWV asserts that Mr. Maron discussed his residency during the interview conducted in December 2011 in Rhode Island that was part of the inquiry which resulted in CVE's verification of KWV as a VOSB. Compl. ¶¶ 28-29. The government contends that Mr. Maron's residency was not known until the Alares protest flagged the issue for OSDBU, and that it was not known to the CVE investigator at the time of the original certification. Hr'g Tr. 21:10-17 (Dec. 20, 2012).

performed, the location of the [veteran] is *considered* in determining whether the [veteran] controls an applicant construction company." AR 570 (emphasis added). This statement is followed by a citation to a decision by the Small Business Administration's ("SBA's") Office of Hearings and Appeals ("OHA") and a summary of Alares' bid protest allegations. *Id.* As will be discussed, the cited decision by SBA supports KWV's position, not that of OSDBU, and the protestor's allegations turn on tenuous inferences. Importantly, OSDBU never even purports to determine Mr. Maron's actual level of involvement in the control of KWV.

By contrast, CVE's detailed investigation focused on the extent and effectiveness of Mr. Maron's personal activities in relation to his control of KWV. Nevertheless, the government urges that the OSDBU decision should control because OSDBU knew Mr. Maron resides in Florida for just over half the year. Hr'g Tr. 21:10-17 (Dec. 20, 2012). That fact, plus the general statement that "[t]he nature of construction requires on-site supervision and direct human contact to adequately complete projects," constitutes the sum of OSDBU's rationale. AR 570.

The SBA decision, *In the Matter of First Capital Interiors, Inc.*, SBA No. VET-112, 2007 WL 2438401 (2007) ("*First Capital*"), is instructive for what it decides as well as for what it does not decide. The decision concludes that a service-disabled veteran did not control the applicant construction firm. The veteran resided in Visalia, California, while the construction company was based in Chillicothe, Ohio. 2007 WL 2438401, at *1. OSDBU considered that the *First Capital* ruling was made simply "because [the veteran] lived thousands of miles from the [company's] headquarters." AR 570. In actuality, SBA explicitly rejected the proposition that distance alone could determine control. *First Capital*, 2007 WL 2438401, at *7 ("[N]either OHA nor SBA maintains a concern *cannot* manage a job that is 2000 miles away from its headquarters." (emphasis added)). Rather, SBA took into account additional factors that included the veteran's seemingly full-time residence three time zones away from the company's situs, the lack of a long-distance management infrastructure, the absence of management experience on the part of the veteran, and the circumstance that the veteran was simultaneously self-employed at two other jobs, both of which were located in California. *Id.* at *7-8.[11]

Mr. Maron, unlike the veteran in *First Capital*, physically is present in Rhode Island, where KWV is based, for nearly half the year and spends the remainder of his time in Florida, both of which are in the same time zone. AR 540. While in Florida, Mr. Maron employs various electronic means to keep track of the day-to-day business of KWV. *Id.*; Pl.'s Mem. at 16.[12] KWV typically only performs one job at a time, with most of the work being performed when Mr. Maron is in Rhode Island. *Id.* Additionally, during periods he spends in Florida, Mr. Maron nonetheless travels to Rhode Island for "any meeting in which anything of importance is discussed." AR 540. He has ample management experience in construction, as his work history

---

[11]SBA had jurisdiction in *First Capital* because it previously held reviewing authority over VA's agency-level bid protests. The transition from self-certification to certification by CVE engendered the transfer of review from SBA to OSDBU. *See* 74 Fed. Reg. 64,619-01. VA's adoption of 48 C.F.R. Part 819 became effective Jan. 7, 2010. *Id.*

[12]As SBA's decision in *First Capital* noted, "technology permits many types of control beyond what w[as] possible years ago." 2007 WL 2438401, at *5.

shows. *See* AR 434. Mr. Maron currently maintains no other jobs or positions, allowing him to focus solely on KWV. *See* AR 434, 541. There is nothing in the record to suggest *credibly* that Mr. Maron could not meet the requirements of the control standard found in Part 74 and incorporated into Part 819, and the government has manifestly failed to articulate any other rationale for denying KWV VOSB status. OSDBU neither "provided a coherent and reasonable explanation of its exercise of discretion, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001), nor articulated a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Based on the foregoing analysis, the court finds that plaintiff is more likely than not to succeed in proving that the government's actions were arbitrary and capricious or not in accordance with law.

### 2. *Irreparable harm.*

KWV contends that it will suffer irreparable harm by way of lost profits if it is not granted injunctive relief. Pl.'s Mem. at 20-21. It has already suffered the loss of a contract worth more than one-and-one-half million dollars, which it had previously been awarded. *Id.* at 21.[13] More drastically, KWV represents that the loss of future work as a VOSB is likely to result in its ultimate demise as a viable concern. *Id.* Removal from the VOSB list prevents it from bidding on any future VOSB set-aside contracts. KWV represents its understanding that re-verification as a VOSB takes between six months to one year, during which time it will lose substantial business and income. *Id.* The injunctive relief contemplated here (setting aside OSDBU's removal of KWV from the VIP database) would circumvent this type of harm because if it prevails, KWV would once again be eligible to compete for and to receive VOSB set-aside contracts.

If KWV succeeds in this suit, as the court finds to be likely, the available remedy would not encompass recoupment of lost profits, making lost profits an irreparable harm. *See Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("[A] disappointed bidder cannot recover lost profits . . . . Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm."). In short, KWV will suffer irreparable harm if injunctive relief does not issue.

### 3. *Balance of hardships.*

The government has argued that setting aside OSDBU's removal of KWV from the VIP list would create an uncomfortable situation for VA when awarding contracts because of the inherent uncertainty of KWV's eligibility to perform on those contracts. Hr'g Tr. 10:12-20 (Jan. 4, 2013) ("[Plaintiff] would potentially submit a low enough bid that they would receive an award, and then the government is in the position of having to either make the award or not, and the only reason that the government wouldn't make the award . . . is that they believe [plaintiff]

---

[13]The government advises that this procurement, which it styles "Solicitation 1," has been awarded to another offeror. Def.'s Opp'n at 2.

10

is not an eligible business for these contracts."). If KWV is restored to the VIP list by the court, however, VA would be obliged fully and fairly to consider KWV's proposals in response to contract solicitations, wholly putting aside OSDBU's arbitrary action. In short, the government's argument assumes wrongly either that VA's contracting officers would ignore this court's injunctive order or, alternatively, that KWV would fail to secure a permanent injunction from the court. Neither assumed circumstance is likely to happen, or can be assumed to occur in the future.

Given the severity of the irreparable harm KWV will suffer in the absence of relief and its likelihood of success on the merits of its claim, the court finds that the balance of hardships weighs in favor of granting a preliminary injunction.

4. *Public interest.*

The public has a strong interest in preserving the integrity of the procurement process. *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242-43 (2010); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004). By ensuring that plaintiff has an opportunity to compete fairly in VOSB set-aside procurements, this public interest will be served.

**CONCLUSION**

For the foregoing reasons, KWV's motion for a preliminary injunction is GRANTED. OSDBU's decision dated October 24, 2012, rendering KWV ineligible for awards of contracts as a VOSB, is set aside. VA shall restore KWV to its roster of approved VOSB entities. KWV's verified eligibility to participate in VA's Veterans First Contracting Program shall be extended by 72 days, to April 22, 2013, to take account of the days it was wrongfully removed from eligibility.

With the agreement of the parties, the court has adopted an accelerated schedule for consideration of the merits of this protest. This grant of preliminary relief should remain in effect for a relatively brief time, expected to be no more than several months, until the court resolves KWV's claim for permanent relief and the government's opposition to that claim. Because this preliminary relief has been structured to avoid the harms that the government indicated might arise with delays in VA's procurement activities,[14] KWV is not required to provide security in any amount.

---

[14]The government avers that the public interest would be "met by allowing the VA to continue with the solicitation process uninterrupted." Def.'s Opp'n at 10. Specifically, the government advises that "[i]f 50 percent of [the] budget for non-recurring maintenance construction projects, including [Solicitation 2], are not obligated through awards by March 31, 2013, the projects will lose funding." *Id.* (quoting Decl. of Judith Ruggiero, Conracting Officer (Jan. 17, 2013)). The court has framed the preliminary injunction to avoid causing any delay in, or impairment of, VA's procurement processes.

It is so **ORDERED.**

s/ Charles F. Lettow

Charles F. Lettow
Judge